UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

        *Plaintiff*,

  -against-

iFRESH, INC. and LONG DENG,

        *Defendants*.

22-CV-3200 (ARR) (SJB)

NOT FOR ELECTRONIC OR PRINT PUBLICATION

**OPINION & ORDER**

ROSS, United States District Judge:

    In this civil action, the Securities and Exchange Commission alleges that defendant iFresh and its former CEO, Long Deng,[1] violated federal securities laws by failing to properly disclose transactions with related parties in iFresh's public filings. Presently before me is the SEC's motion for a final judgment ordering iFresh to disgorge its ill-gotten gains, plus pre-judgment interest, and imposing a civil monetary penalty. iFresh has filed a cross-motion to exclude the expert report upon which the SEC's disgorgement calculation relies. For the reasons stated herein, I GRANT the SEC's motion and DENY iFresh's cross-motion.

## BACKGROUND

    The SEC filed its Complaint on May 31, 2022, alleging that defendants misled investors "by hiding and misstating information about related party transactions that iFresh entered into with entities owned and controlled by Deng and his brother." Compl. ¶ 1, ECF No. 1. A "related party transaction" is one between two parties that are closely associated. *Id.* ¶ 2; *see* 17 C.F.R. § 229.404. Federal securities laws require publicly traded companies such as iFresh to disclose any related

---

[1] Defendant Deng has consented to a judgment imposing permanent injunctions and requiring him to pay disgorgement and civil penalties. *See* Judgment as to Defendant Long Deng, ECF No. 32. I entered final judgment against Mr. Deng in May 2023. *See id.*

party transaction exceeding $120,000. Compl. ¶ 2, 30; *see* 17 C.F.R. § 229.404(a). The SEC alleges that between August 10, 2016 and August 13, 2020, iFresh engaged in numerous related party transactions and failed to disclose over twelve million dollars in such payments. *Id.* ¶ 3–4. In doing so, the SEC contends, iFresh violated Section 17(a) of the Securities and Exchange Act of 1933, and sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Securities and Exchange Act of 1934, as well as Rules 10b-5, 12b-20, and 13a-1 thereunder. *Id.* ¶ 8.

iFresh consented to a bifurcated process for resolving the SEC's claims against it, whereby I would address injunctive relief separately from penalties. *See* Consent of Def. iFresh, Inc. ¶ 3 ("Consent of iFresh"), ECF No. 15-2. On October 17, 2022, I entered partial judgment against iFresh permanently restraining and enjoining it from violating the securities laws and regulations at issue. Mot. for J. Based on Settlement Bifurcated, ECF No. 15; J. as to Def. iFresh, Inc., ECF No. 24. As part of this settlement, iFresh agreed that for the purposes of the SEC's forthcoming motion for disgorgement and civil penalties, all allegations in the Complaint would be accepted as true. Consent of iFresh, Inc. ¶ 3. The SEC filed that motion on October 11, 2023. Mot. for J. as a Matter of L., ECF No. 33. iFresh filed its cross-motion and opposition on December 1, 2023. Cross-Mot., ECF No. 37; Mem. Supp. Cross-Mot. to Exclude Expert Testimony & in Opp'n to Pl.'s Mot. for J. as a Matter of L. ("Cross-Mot."), ECF No. 38.

## LEGAL STANDARD

### I. Remedies for Violations of Securities Laws

When a party violates federal securities laws, a district court "has broad discretion not only to order the disgorgement of any ill-gotten gains, but also to determine the amount to be disgorged." *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 562-63 (S.D.N.Y. 2009); *see also* 15 U.S.C. §§ 78u(d)(5), (7). "Disgorgement is a method of forcing a defendant to give up the

2

amount by which he was unjustly enriched." *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (quotation marks omitted). It also serves "to deter violations of the securities laws by depriving violators of their ill-gotten gains" and "to compensate securities fraud victims for their losses." *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997). Because this equitable remedy "is about '*return[ing]* the funds to victims,'" it is appropriate only where victims "suffered pecuniary harm." *SEC v. Govil*, 86 F.4th 89, 104–05 (2d Cir. 2023) (quoting *Liu v. SEC*, 140 S. Ct. 1936, 1948 (2020)).

The amount of ill-gotten gains need not be determined "with exactitude": A "reasonable approximation of profits causally connected to the violation" will suffice. *Razmilovic*, 738 F.3d at 31 (quotation marks omitted). Once the SEC meets its burden of establishing such an approximation, the burden shifts to the defendant "to show that his gains were unaffected by his offenses." *Id.* (quotation marks omitted). Any risk of uncertainty falls on the defendant, who bears the burden of "show[ing] what transactions were unaffected by [its] offenses." *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996). Furthermore, a defendant's inability to pay does not prevent a court from ordering disgorgement: "The fact that swindlers have run through the proceeds of the fraud and are now insolvent should not prevent the imposition of a remedy, since defendants may subsequently acquire the means to satisfy the judgment." *SEC v. Inorganic Recycling Corp.*, No. 99-CV-10159 (GEL), 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002) (quotation marks omitted); *see also SEC v. Juno Mother Earth Asset Mgmt.*, No. 11-CV-1778, 2014 WL 1325912, at *3 (S.D.N.Y. Mar. 31, 2014); *SEC v. Alt. Green Techs., Inc.*, No. 11-CV-9056, 2014 WL 7146032, at *4 (S.D.N.Y. Dec. 15, 2014).

Pre-judgment interest, like disgorgement, is discretionary. *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996). "Requiring payment of interest prevents a defendant from

<mark>3</mark>

obtaining the benefit of what amounts to an interest[-]free loan procured as a result of illegal activity." *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007) (quotation marks omitted). Courts typically approve the use of the IRS underpayment rate to determine the interest rate imposed. *First Jersey Secs.*, 101 F.3d at 1476.

Federal courts are also authorized to order civil monetary penalties for violations of the Securities and Exchange Act. *See* 15 U.S.C. § 78(u)(d)(3)(A). There are three tiers of penalties available for each violation of the securities laws. *See id.* § 78(u)(d)(3)(B). "[A] second-tier penalty may be imposed if the violation 'involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.'" *Razmilovic*, 738 F.3d at 38 (quoting 15 U.S.C. § 78(u)(d)(3)(B)(ii)). "The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court." *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005). Courts exercising this discretion weigh: "(1) the egregiousness of the violation; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; and (4) the sincerity of defendant's assurances against future violations." *Haligiannis*, 470 F. Supp. 2d at 384.

## II. Expert Witnesses

Under Federal Rule of Evidence 702, expert testimony is admissible if the party seeking to introduce the evidence demonstrates that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

District courts must conduct "a preliminary assessment of whether the reasoning or methodology underlying the [proffered expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*,

509 U.S. 579, 592–93 (1993). The *Daubert* assessment "is fluid and will necessarily vary from case to case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("[T]he gatekeeping inquiry must be tied to the facts of a particular case." (quotation marks omitted)). "[O]nly serious flaws in reasoning or methodology" warrant the exclusion of expert testimony; otherwise, "[i]f an expert's testimony lies within 'the range where experts might reasonably differ,' the jury, and not the trial court," should decide how heavily to weight it. *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (quoting *Kumho Tire*, 526 U.S. at 153).

## DISCUSSION

As an initial matter, I find that the preconditions for the remedies sought by the SEC are all met. iFresh has agreed that, for the purposes of this motion, the allegations of the Complaint shall be deemed true—and taken as true, the Complaint details violations of federal securities law for the reasons detailed in the SEC's motion. Consent of iFresh ¶ 3; *see generally* Mem. Supp. of Mot. for Remedies and Final J. 2–6 ("Mot."), ECF No. 34. iFresh does not argue otherwise, nor could it, given the terms under which it consented to a bifurcated resolution of this matter. *See generally* Cross-Mot.; *see also* Consent of iFresh ¶ 3 ("Defendant further agrees that in connection with the Commission's motion for disgorgement and/or civil penalties . . . Defendant will be precluded from arguing that it did not violate the federal securities laws alleged in the Complaint."). The SEC's allegation that iFresh's stock prices were artificially inflated during the relevant time period, taken as true, also establishes the requisite pecuniary harm to those who purchased iFresh stock during that time period. Compl. ¶ 83; *see Govil*, 86 F.4th at 104.

The central issue, then, is whether I should exercise my discretion to order disgorgement, as well as pre-judgment interest and a civil penalty. The SEC seeks to meet its burden of showing

a "reasonable approximation" of profits connected to the violations by relying on the expert report of Dr. Martina Martynova. *See* Mot. 6–8. This expert estimated iFresh's ill-gotten gains by calculating the amount iFresh's stock price was inflated during the relevant time period and multiplying its proceeds from each stock-based transaction during that time by that amount. *See* Tushaus Decl., Ex. 1 at 10–14 ("Martynova Report"), ECF No. 35. iFresh in turn seeks to exclude Dr. Martynova's expert report because she is not a qualified expert. *See* Cross-Mot. 4–7.

Dr. Martynova has decades of academic and professional experience in finance, economics, and valuation. *See* Martynova Report at 1; *see also id.* App. A. Specifically, she holds a PhD in Finance from Tilburg University and worked as a financial economist at Cornerstone Research for seven years before joining the SEC as a financial economist, where she has worked for over seven years. *Id.* In these capacities, she has worked on numerous cases that required the estimation of the benefit to a company resulting from its misconduct. Cross-Mot., Ex. 1 at 27:2-11 ("Martynova Tr."). At both Cornerstone and the SEC, she has specifically worked on matters that involve estimating the benefit to a company resulting from its transactions with related parties—precisely the sort of transactions involved in this case. *Id.* at 37:24–38:24; 44:7–46:24. Dr. Martynova has analyzed stock price inflation hundreds of times. *Id.* at 29:22-25.

iFresh contends that the SEC failed to establish Dr. Martynova's competence because she lacks specific expertise in ill-gotten gains, related party transactions, or stock price inflation. Cross-Mot. at 4–7. Its arguments to that effect, however, are either unpersuasive or rest on mischaracterizations of the record. First, iFresh points out that Dr. Martynova admitted that she never published any articles or issued any expert reports concerning these specific issues; it also notes that she was unable to point to public cases where her stock price inflation analysis was used. *Id.* at 6–7. Although Dr. Martynova did testify that she has never personally provided expert

6

testimony, Martynova Tr. at 25:22-24, 36:10-13, she also explained that her role is typically that of a consultant, and that she has supported other experts in reports that have been accepted by courts multiple times, *id.* at 36:3-9; she further elaborated that much of her work at the SEC is not public-facing, *id.* at 34:25–35:1-22. And although Dr. Martynova testified that she has not published scholarly articles on ill-gotten gains, related party transactions, or stock price inflation *id.* at 50:2-24, she explained that she "retired" from publishing scholarly articles in 2012, *id.* at 49:24–50:1—early in her time at Cornerstone, not long after leaving academia, *see* Martynova Report, App'x A.

"Any one of the qualities listed in Rule 702—knowledge, skill, experience, training, or education—may be sufficient to qualify a witness as an expert." *SEC v. Ripple Labs, Inc.*, No. 20-CV-10832, 2023 WL 5670711, at *4 (S.D.N.Y. Mar. 6, 2023) (quotation marks omitted). There is no requirement that a witness have previously testified as an expert to be qualified, *see Harrison v. Howmedica Osteonics Corp.*, No. 06-CV-745, 2008 WL 906585, at *9 (D. Ariz. Mar. 31, 2008); *Ghaner v. First Liberty Ins. Corp.*, No. 21-CV-1392, 2023 WL 5565004, at *3 (M.D. Fla. June 26, 2023); nor must an expert have published scholarly articles on the subject matter at issue to be qualified under Rule 702. iFresh's reliance on *SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013), and *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002), is misplaced: *Tourre* involved an expert with absolutely "no education, expertise, or experience" in the area upon which he opined, 950 F. Supp. 2d at 676-77, and *LinkCo* dealt with an expert who relied on "credentials rather than analysis" and was unable to explain how he reached his conclusions, 2002 WL 1585551, at *3–4. Dr. Martynova, by contrast, has ample education, expertise, and experience in estimating stock price inflation and ill-gotten gains; she

does not merely rely on her credentials, but has explained in detail how she reached her conclusions.

Next, iFresh asserts that Dr. Martynova was unable to point to any scholarly articles or materials supporting her ultimate conclusions, *see* Cross Mot. at 6, but this is incorrect. Dr. Martynova's expert report cites to several scholarly articles that supported her analysis, Martynova Report at 6 ns. 19–21, and includes an appendix identifying the materials regarding iFresh upon which she relied, as well as other scholarly works, *see id.* App. B. iFresh is similarly misleading when it states that Dr. Martynova failed to do any independent research on comparable companies. *See* Cross Mot. at 6–7. Read in context, Dr. Martynova's testimony made clear that she relied on iFresh's predecessor's own list of comparable companies because this was available to investors and would have affected investors' valuation of the company, *see* Martynova Tr. at 129:9–130:8— not because, as iFresh seems to suggest, she could not be bothered to identify comparable companies on her own. The SEC also persuasively points out that Dr. Martynova's analysis of comparable companies was ultimately irrelevant to the amount it requested for disgorgement, because that figure was informed by a different analysis that yielded a more conservative result. Reply in Supp. of Mot. for Remedies and Final J. at 7 n.1, ECF No. 39 ("Reply").

Finally, defendant is disingenuous in its assertion that that Dr. Martynova "admi[tted] that many of her ultimate conclusions were only derived from her generalized 'background in finance.'" Cross Mot. at 7. Dr. Martynova referred to her background in finance only when defendant asked her what she would rely upon if the articles she cited did not support her conclusions—an assumption for which defendant has provided no evidence. *See* Martynova Tr. at 104:2–105:2. Dr. Martynova further testified that she has been "living and breathing" this type of analysis for her "entire professional life." *Id.* at 105:24–106:4. And as discussed, she has conducted

8

hundreds of analyses of stock price inflation, including matters involving transactions with related parties. *Id.* at 27:2-11; 29:22-25; 37:24–38:9; 44:22–46:24.

iFresh's cross-motion focuses on Dr. Martynova's qualifications, although it appears at times to conflate the question of her qualification with the question of her opinion's reliability. *See* Cross-Mot. at 4, 6. In any event, the SEC has met its burden of demonstrating that Rule 702's criteria are met. Dr. Martynova's "specialized knowledge," discussed above, will help me, "the trier of fact[,] . . . determine" the appropriate amount of disgorgement. Fed. R. Evid. 702(a). Her report is "based on sufficient facts or data," Fed. R. Evid. 702(b), such as iFresh's public filings, investigative testimony exhibits, publicly available data, academic research articles, and textbooks, *see* Martynova Report, App. B. Dr. Martynova used "[s]tandard analytical methods . . . to calculate ill-gotten gains," Martynova Report at 10, rendering her report "the product of reliable principles and methods," Fed .R. Evid. 702(c). And she explained in detail how she reliably applied these methods to the facts of this case. Fed. R. Evid. 702(d); *see* Martynova Report at 10–14. iFresh's attempts to characterize Dr. Martynova's testimony as unreliable rest on the same grounds as its attempts to deem her unqualified, *see* Cross-Mot. at 4–7; iFresh has not suggested any alternative method of calculating its ill-gotten gains, nor has it disputed any of the facts upon which Dr. Martynova's analysis relied.[2]

---

[2] Because there are no genuine disputed issues of fact, the SEC's motion for final judgment is not premature. *Contra SEC v. Gallison*, No. 15-CV-5456, 2023 WL 3004882, at *5 (S.D.N.Y. Feb. 4, 2023), *report and recommendation adopted,* No. 15-CV-5456, 2023 WL 3090857 (S.D.N.Y. Apr. 26, 2023) (denying summary judgment where the defendant offered evidence challenging the SEC's estimate of pecuniary gain); *cf. SEC v. Lek Secs. Corp.*, 612 F. Supp. 3d 287, 294 (S.D.N.Y. 2020) (reasoning that defendants' "conclusory assertion that the SEC failed to carry its burden" was insufficient to render the SEC's approximation of profits unreasonable).

9

I accordingly conclude that the SEC has met its burden of showing a "reasonable approximation" of gains causally connected to iFresh's violations, and that iFresh has not demonstrated that this estimate is unreasonable. *Razmilovic*, 738 F.3d at 31. iFresh's assertion that defendant Deng's actions have "stripped iFresh of its assets" does not render disgorgement inappropriate, given that iFresh "may subsequently acquire the means to satisfy the judgment." Cross-Mot. at 8; *Inorganic Recycling Corp.*, 2002 WL 1968341, at *2. iFresh argues that the SEC should be seeking recoupment from Mr. Deng, not iFresh, because Mr. Deng has repurchased iFresh's primary asset, and because the misconduct alleged in this action "harm[ed] iFresh for the benefit of [Mr. Deng] and his family members." Cross-Mot. at 8–9. But this argument is unavailing: As the SEC points out, iFresh benefitted from Mr. Deng's misconduct, and it would be inequitable to waive financial remedies because of that misconduct. Reply at 9–10 & n.3.

Prejudgment interest and a civil penalty are likewise appropriate. I have discretion to order that any disgorgement award include prejudgment interest, *see Haligiannis*, 470 F. Supp. 2d at 385, and the SEC has calculated prejudgment interest using the routine method to which iFresh has already consented, *see First Jersey Secs.*, 101 F.3d at 1476; Consent of iFresh ¶3. I am similarly authorized to impose a civil monetary penalty, and I conclude that a one-time second-tier penalty is appropriate given the repeated reckless conduct and resulting losses to other persons detailed in the Complaint. *See* Compl. ¶¶ 31–83. Contrary to iFresh's assertion, there is no requirement that the SEC present evidence of bad faith to obtain pre-judgment interest or civil penalties[3]—and in

---

[3] The cases cited by iFresh do not suggest otherwise. *See* Cross-Mot. at 9 n.2. *Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999), merely held that a district court did not abuse its discretion in declining to order pre-judgment interest where the defendants may have acted in good faith—it did not impose a bad faith requirement. *Id.* at 767. And the district court in *Analytical Survs., Inc. v. Tonga Partners, L.P.*, No. 06-CV-2692, 2008 WL 4443828 (S.D.N.Y. Sept. 29, 2008), considered the lack of evidence of bad faith as part of its exercise of discretion; it did not suggest

10

any event, the Complaint, taken as true for the purposes of this motion, contains ample allegations that iFresh knowingly or at least recklessly violated securities laws. *See, e.g.*, *id.* ¶¶ 57–59, 64–66, 76, 78 (explaining how Mr. Deng, despite knowing that iFresh had engaged in related party transactions and that this was a significant area identified by iFresh's auditor, failed to take appropriate steps to ensure that iFresh was properly disclosing these transactions to the public); *see also Constr. Labs. Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 549 (S.D.N.Y. 2020) (holding that a CEO's scienter may be imputed to a company).

## CONCLUSION

For the reasons set forth above, the SEC's motions is GRANTED and iFresh's motion is DENIED. Judgment shall be entered against iFresh in the amount of $1,657,478, which consists of $1,002,893 in disgorgement, $104,585 in pre-judgment interest, and $550,000 in civil penalties.

SO ORDERED.

                                                                                        /s/
                                                            Allyne R. Ross
                                                            United States District Judge

Dated:        February 5, 2024
                Brooklyn, New York

---

that bad faith was a prerequisite to an award of pre-judgment interest. Neither case addresses civil penalties.